AMELIO CORTÉS MEDIALDUA, Plaintiff and Appellant, v. HEIRS OF JUAN PALÉN AGUILA, Defendants and Appellees.

No. 4408. Argued May 4, 1928.—Decided March 19, 1929.

A. Lens Cuena for the appellant. L. Mercader for the appellees.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Amelio Cortés sued the named heirs of Juan Palén to recover four thousand dollars.

He alleged that on December 24, 1925, Juan Palén received that sum from Francisca Palén and promised to pay it to her on June 30, 1926, signing to that effect and delivering to Francisca Palén the following obligation:

"December 24, 1925.—I owe and will pay to Francisca Palén on June 30, 1926, the sum of four thousand dollars. In witness whereof I sign the present here in Arecibo on December 24, 1925. (Signed) Juan Palén.—$4.000."

He alleged also that in April, 1926, Francisca Palén transferred and assigned the said document to him for value received; that Juan Palén died in May, 1926, and that the obligation is due and has not been paid in whole or in part.

In their answer the defendants denied the debt of their ancestor to Francisca Palén, denied also that their ancestor signed the document copied into the complaint and denied that the said document was transferred and assigned to the plaintiff.

They alleged as defense that Francisca was a sister of Juan Palén and had been living free for some years in a house of her brother; that Palén had an important business of lending money and during the last six years supported his sister and her family, leaving at his death more than twenty thousand dollars; that he made a will and as he left nothing by it to his sister, she asked him to give her some money with which to buy a small house; that Palén promised to do so, but as he died without fulfilling his promise, Francisca and her husband "have attempted to feign a loan which they say appears in the simulated and false promissory note copied into the complaint," and that as Francisca "did not dare to collect directly from the defendants the aforesaid false and simulated note inserted in the complaint in this suit, she combined with the plaintiff that he appear as assignee, although both of them know that that obligation is spurious."

The defendants also filed a counter-complaint alleging the falsity of the document referred to and praying the court for a specific pronouncement on that question.

At this stage the case went to trial. Both parties introduced evidence and the court finally rendered judgment dismissing the complaint and sustaining the counter-complaint and consequently declaring the note given on December 24, 1925, by Juan Palén to Francisca Palén for the sum of four thousand dollars to be void as simulated, with the costs on the plaintiff.

The plaintiff appealed to this court and has assigned in his brief several errors which may be condensed into one, i. e., error in weighing the evidence.

In support of his judgment the trial judge delivered an opinion which contains an analysis of the evidence. It is as follows:

"The note sued on is for four thousand dollars maturing on June 30, 1926. On April 7, 1926, it appears to have been assigned to the plaintiff for the sum of three thousand five hundred dollars. Juan Palén the maker of the note died in May, 1926, a month before the aforesaid assignment and one month after the date on which the note matured. Palén was a merchant of good standing in Arecibo, owned property and had sufficient funds in the Banco Comercial to meet an obligation of that nature.

"A careful examination of the evidence in this case reveals that there was no valuable consideration for the alleged assignment of the note by Francisca Palén to the plaintiff. Gabriel Terraza, a witness for the plaintiff and the husband of Francisca Palén, testified that the assignment of the $4,000 note was made for $3,500 because he was in need of money by reason of the foreclosure proceeding instituted by the Banco Comercial on a property belonging to him, and that the document was assigned for a consideration which was paid in several installments. However, it appears from the document that it was assigned for $4,000, acknowledged to have been received. Following the witness, one is struck by the fact that it should have been necessary and urgent to alienate for $3,500 a note for $4,000 maturing fifty-three days later to avoid execution on a property. That that testimony was not true is shown by the fact that later the same witness testified that the amount of that transaction 'is in his posses-

sion, that he is not in need of it, that it is not deposited,' although immediately he testified that 'it is invested in several houses, in lands,' without explaining his previous statements with respect to the necessity of assigning the note in order to avoid an execution. He testified that he had used the $3,500 and that his wife 'is informed about that,' although she, Francisca Palén, testified that she did not know how that money was used. The theory that the assignment of the note was due to the immediate need of money by Francisca Palén, as said by the plaintiff, is left without support. The plaintiff testified that he acquired that note, and Juan Candelaria, although his testimony is not very satisfactory as regards other particulars, testified positively that the plaintiff informed him in the presence of Miguel A. Ramos in referring to the assignment that 'he (Cortés) had no interest in the transaction and was making it to help Gabriel Terraza.' Ramos was dead, but the plaintiff admits that he had a talk with Ramos in the presence of Candelaria on the matter although he had not made those statements. From all of the circumstances the court believes that he did make them.

"The plaintiff testified that he saw Palén on his deathbed and spoke to him about the note and that Palén gave his consent to its acquisition by him. If Palén was obsessed with the idea that his sister should have a house, as will be noticed further on, it can not be explained how Palén, having sufficient money to make good the amount involved, should give his assent to a transaction in which his sister was losing $500, as the note would mature shortly thereafter. But the fact is that the widow of Palén testified emphatically with every appearance of truth that she never saw the plaintiff visiting the invalid in her home, and that she saw him for the first time when she was testifying.

"Moreover, it is shown by the evidence that the signing of the note by Palén in favor of his sister was not for valuable consideration, and this was known to the plaintiff. Gabriel Terraza, testified that he and Juan Palén had been partners in a business which they had been compelled to liquidate; that they were in debt $18,000; that in order to pay that indebtedness he mortgaged all of his properties; that Juan Palén owed him $8,000 which he covered with two promissory notes of $4,000 each which were extended several times; that of the two notes the one which is the subject matter of this litigation was made payable to his wife at the request of Juan Palén who desired 'to leave that money to her, that he desired it to be given to his wife (Francisca Palén) with which to buy a small house on his (Juan Palén) death.' Francisca Palén says that she does not know how

the transaction was carried out, but does know that it was her husband, Gabriel Terraza, who proposed that 'the notes be made payable to her, because my husband desired them to be made to me.'

"It is our firm belief that Juan Palén owed nothing to his sister, that is, that there was no valuable consideration for the note. As soon as Palén and Terraza liquidated their business Palén set up in business again, his establishment being next to the market place. He was successful and acquired a great deal of property, according to Terraza. He had a current account with the Banco Comercial and his transactions amounted to some thousands of dollars, as testified to by the witness Iglesias, the teller of the bank. He never bothered about paying the note made in favor of his sister. A month before he died, on the assignment of the note to the plaintiff at a loss of five hundred dollars, Juan Palén had sufficient cash to honor the document. Although Palén told notary Zeno that he owed that sum to his sister, the court understands that attitude of Palén. He was grateful to his sister who was bringing up for him a natural child and had always entertained the idea of providing his sister with a house of her own, and it can be seen that Gabriel Terraza mentions the insistence of Palén on making out the note to her 'with which to buy a house if he died.' It may be observed that although mention is made of two notes, Francisca Palén testified repeatedly that her brother 'owed her four thousand dollars only,' and that she was going to use that money 'to purchase a house.'"

Although we might find an explanation for the judgment of the court and perhaps there is some truth in it, a careful and repeated examination of the record leads us to the conclusion that the proof of simulation is not sufficient to destroy the presumption of truth which the document carries with it as authentic beyond all doubt and the testimony of the persons directly involved in the transaction.

The first witness was the plaintiff. He is a merchant in Arecibo, managing partner of Márquez Brothers, treasurer of the Plata Sugar Co. and of the Soller Sugar Co., with an annual salary of one thousand dollars for each of his jobs as treasurer, knows Francisca Palén and acquired from her the note through her husband, Gabriel Terraza. Terraza told him that he needed money to cancel a mortgage and he gave him three thousand five hundred dollars for the note.

Before closing the transaction he had a talk with Juan Palén who agreed. On cross-examination by counsel for the defendants he said that he saw Palén in his home when he was sick; that he delivered to Terraza $1,750 in April, $1,500 in May and the rest in June; that Terraza is employed by the Plata Sugar Company and by the Soller Sugar Company at a salary of $75 per month from each. The cross-examination was long. The witness did not contradict himself and explained everything asked him.

Other witnesses were Eduardo Iglesias Jordán, teller of the Banco Comercial de Puerto Rico, Arecibo Branch, and its branch manager Alfonso Alfonso with whom Juan Palén had had business dealings for several years and who positively identified the signature at the foot of the note as that of Juan Palén. The note was then admitted in evidence over the objection of the defendants.

The next witness was attorney and notary Gustavo Zeno Sama who said:

"Yes, Sir; some promissory note. Just on the day following that on which he came to speak to me about preparing his will he directed me to draw a promissory note for four thousand dollars in favor of his sister Francisca Palén and while I was writing the note he told me that he owed her a similar sum and had given her another note."

Palén died. The promissory note signed by him speaks for itself and there is the testimony of notary Sama which was admitted without objection. The obligation had not been satisfied. The plaintiff presented thus to the court a *prima facie* perfect case. But the plaintiff also called as a witness Gabriel Terraza Ferrer who testified that being in need of money by reason of the execution on his property by the Banco Comercial, he negotiated the note with the plaintiff with his wife's consent. The plaintiff gave him three thousand five hundred dollars in several installments. He explains the origin of the promissory note. He was Palén's partner in business. They liquidated the business with a

balance against it of eighteen thousand dollars and he had to mortgage his properties to secure the indebtedness, accepting from Palén two promissory notes which were being paid off and extended in favor of other persons and finally the note for four thousand dollars sued on was made payable to his wife "because Juan Palén said that he desired it to go to my wife for her to buy a house on his death." Having been ably examined, he did not contradict himself.

What was the evidence of the defendants? Their first witness to testify was Francisca Palén who identified the will of her brother without leaving her anything. She also admitted that she was living in a house belonging to her brother free of rent, but explained that there was living with her a natural child of her brother who was being taken care of by her. Repeatedly she answered that the debt represented in the promissory note was real and that her husband negotiated the note with the plaintiff with her consent.

Then follows the testimony of Frutos Palén and José Terraza. They speak of the commercial books of Juan Palén in which there is no record of the debt stated in the note. They also refer to the support given by Palén to his sister and to the gift of a pianola by him to his sister's daughter.

José Alvarez, a clerk of Juan Palén, said that Palén used to send to his sister an allowance of $1.50 daily and that in conversation with Francisca Palén she would show her gratitude towards her brother. She never mentioned to him any debt. He knew that she was taking care of a child of her brother. Gonzalo Acevedo knew Palén as a merchant who transacted the greater part of his business in cash; that he had money and left property at his death. Questioned by counsel for the plaintiff, he testified that at his death his debts might have amounted to four or five thousand dollars.

Juan Candelaria testified that Juan Palén did not owe anything to Francisca. Being required to explain the reason for his statement, he answered: "He did business on a cash basis and his purchases were big. For a small discount he

would pay cash.'' He referred to a certain conversation between the plaintiff and Miguel Ramos, now dead, in connection with the assignment of the note, during which ''Cortés told Ramos that he had no interest in the transaction, that he was doing so only in order to aid Gabriel Terraza who had a job there.''

Gregoria Candelaria, the widow of Juan Palén and one of the defendants, testified that Francisca Palén ''told me that in case of the death of Juan you will take his place in our estimation because you are his wife and I love him and should he die just as I love him I want to get on with you as I did with him; and I want you, should he die at any time, you know that he is the only person who helps me and I want you . . . She meant to say that she. . . Q.—Not what she meant to say but what she said. That as she had no home and the only help came from that brother, in the event of his death she wanted left to her the house she was living in so that she might complete the education of her children and help herself.''

She said that she did not know anything about the promissory note and that the plaintiff was never in her house during her husband's illness.

Mercader, attorney for the defendants, also testified in regard to his negotiations with Juan Palén who explained to him that he wanted to buy a certain house in order to help his sister; that Palén was a business man who besides used to lend money at a moderate rate of interest; that the plaintiff on several occasions came to his office and talked about the debts of the heirs of Palén to Marques Brothers, but not about the note; that on his death Palén left property including more than fourteen hundred dollars in cash, etc.; that he did not owe anything to his sister. Cross-examined about this the following took place:

''Q.—Why do you say that nothing was owing to Francisca Palén, why such a positive statement? I make that statement because I also knew the fact that this man went to ask me to sell him the house.

Q.—Is that a deduction drawn by you? From the facts of his having come to me to buy the house and of his asking me to sell the house to him. Q.—Is that a deduction drawn by you? Yes, because his sister was in poor circumstances and had nothing to live on.''

Certain documents were produced in connection with the property left by Palén at his death.

Is that evidence of the defendants sufficient to destroy the *prima facie* case of the plaintiff? Not at all, in our opinion.

The defendants not only alleged that their ancestor owed nothing, but also that he had not signed the note. The evidence showed clearly that the signature of Palén appearing at the foot of the note was genuine.

The fact that the document reads that it was assigned for its face value of $4,000 and that the plaintiff testified and Terraza admitted that it was for only $3,500 does not show the inexistence of the transaction. If the witnesses had been persons accustomed to lie, it would have been very easy for them to conform their testimony to the contents of the document. They seem to have preferred telling the truth, although it might suggest the contradiction noticed.

The fact that Terraza testified, as stated by the trial judge in his opinion, that he was keeping the money and said later that he had invested it is not an absolute contradiction. Money of another may be kept in a safe or wisely invested so as not to leave it idle and unproductive. That the second alternative, if properly carried out, is the better one appears marvelously illustrated in the parable of the talents. The circumstance of the necessity of negotiating the document in order to prevent a mortgage foreclosure is not in conflict with the subsequent use of the money. Time had elapsed and it might have served for both purposes.

We can not perceive the importance of the contradictions referred to by the trial judge between the testimony of Terraza and that of his wife as regards her knowledge of how the money had been invested.

What witness Candelaria put in the mouth of the plaintiff in his conversation with Ramos is so vague that it can not induce a conclusion that it was a case of a simulated assignment. It was logical for Terraza to apply to Cortés in view of their relations and it was natural for Cortés to be willing to help Terraza and did so without prejudice to himself.

The plaintiff said that he went to see Palén when he was sick. The widow is sure that the plaintiff did not go to see her husband. The two witnesses are equally interested. The court gave credit to the widow. It is not a fundamental and decisive fact and although it be admitted that it was the widow who told the truth, that would imply that the plaintiff did not go to see Palén and would affect generally the greater or less degree of credibility of the plaintiff as a witness, but would not destroy completely the other particulars of his testimony.

In no way can we agree that the evidence shows that the note in favor of Francisca was not made for a valuable consideration. The testimony of Terraza about the old debt originating in the liquidation of the firm of Palén & Terraza and about the making of the notes has not been destroyed by any evidence and is logical. It was a family matter. The fact that although it was a debt Palén used it to secure the future of his sister is not extraordinary.

If the field of suppositions is entered, why not think that in dissolving the partnership between the brothers-in-law Palén and Terraza, Palén was the strong and clever man who apparently was left without debts and was able to make his way in business, and Terraza was the modest man who assumed all of the liabilities?

Their characters are reflected in the methods followed by them after the dissolution of the partnership. Palén went into the field of strenuous life; Terraza became an employee as bookkeeper of several firms. There is nothing extraordinary in the fact that Palén, strong, prosperous and active, fond of giving, should appear as protector, although in fact

a debtor in the modest home of his sister. He probably supplied it with the luxuries which Terraza could not afford with his salary. But to infer from this that Terraza and his sister were insolvent, as alleged by the defendants in their counter-complaint, is going too far.

The evidence introduced by the defendants may cause a judge to doubt, but it is not sufficient, as already said, to destroy the presumption of truth which arises from the note itself or to show that the testimony of Terraza and the plaintiff was false.

Such being the case, we must conclude that the district court committed the errors assigned by the appellant and its judgment must be reversed and substituted by another sustaining the complaint and dismissing the counter-complaint, all without special imposition of costs.